IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:04CV525-H

| | |
|---|---|
| DAVID JAMES SALTER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GASTON LIFE SAVING AND FIRST )<br>AID CREW, INC., )<br>)<br>Defendant. )<br>)<br>_____ ) | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the following motions and memoranda:

1. The "Defendant's Motion for Summary Judgment [with exhibits attached]" (document #16) and "Memorandum ... In Support ..." (document #17), both filed March 3, 2006;

2. The "Plaintiff's Memorandum in Opposition [with attached exhibits]" (document #18) filed March 20, 2006;

3. Defendant's "Motion to Strike and Memorandum of Law in Support [with attached exhibits] ... " (document #20) and "Reply [in support of Motion for Summary Judgment] ..." (document #21), both filed April 3, 2006;

4. "Plaintiff's Memorandum in Opposition ... to Motion to Strike [with attached exhibit] " (document #22) filed April 12, 2006; and

5. "Defendant's Reply in Support of ... Motion to Strike" (document #38) filed April 24, 2006.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Defendant's Motion to Strike, but <u>grant</u> its Motion for Summary

Judgment, as discussed below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is an action seeking damages and equitable relief for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(e)(1) ("Title VII") and state public policy.

Plaintiff David Salter is a resident of Gastonia, North Carolina, who received his "North Carolina Basic Level Emergency Medical Technician" certificate in late 2000 or early 2001. The Plaintiff has also obtained his "North Carolina Intermediate Level Emergency Medical Technician" certification and has completed approximately eighty percent of the courses needed to obtain an "Emergency Rescue Technician" certificate. The Plaintiff also has certifications for "Firefighter 1," "Tactic Medic," "Personal Watercraft Rescue," and "Swift Water Rescue."

Defendant Gaston Life Saving and First Aid Crew, Inc. is a North Carolina corporation with a facility in Gastonia, North Carolina that provides rescue and ambulance services in Gaston County through a contract with the County. To meet this obligation, the Defendant employs several full-time, part-time and volunteer employees to staff various shifts of the 24-hour day, seven days per week.

In March 2002, the Plaintiff was hired by the Defendant as an "Emergency Medical Technician-Defibrillation," and worked 40 hours per week at a wage of $8.56 per hour. At all times relevant herein, the Plaintiff's immediate supervisor was Deeda Sanford.

The Plaintiff was initially assigned to work the Tuesday through Friday, 10am to 8pm shift ("first shift"). Approximately six to eight months later, the Plaintiff requested a shift transfer and his hours were changed to Tuesday through Friday, 8pm to 6am ("night shift"), although his hourly compensation remained the same. In the light most favorable to the Plaintiff, while he was

2

working the night shift for the Defendant, he took classes at a local community college and worked a second, part-time job during the daytime hours.

The Complaint and the Plaintiff's briefs are replete with generalized accusations of retaliation, however, there is little, if any, evidence, even taken in the light most favorable to the Plaintiff, that he was ever subjected to unlawful workplace retaliation. In his Complaint, he alleges that he "participated" in an investigation conducted by the Equal Employment Opportunity Commission ("EEOC") concerning allegations of workplace discrimination made by Amanda Lembke, who was both the Plaintiff's co-worker and girlfriend ("the Lembke investigation"). Ms. Lembke contended that sometime in 2002, the Defendant had disciplined her purportedly for sleeping on the job, but in reality for becoming pregnant.[1]

During his deposition, the Plaintiff testified that his only participation in the Lembke investigation (prior to his resignation discussed below) was by surreptitiously taking photographs of Ms. Lembke's supervisor, Calvin Cagwin, at a time when Mr. Cagwin was asleep on duty, and giving those photographs to EEOC Investigator Roscoe Hood. Although the Plaintiff could not recall the exact date that he took the photographs, he testified that neither Mr. Cagwin nor any other of the Defendant's managers, supervisors or other decision-makers were aware of these activities until Mr. Hood interviewed Mr. Cagwin, discussed below.

According to the Defendant's undisputed business records, on June 2, 2003, a Monday, Ms. Sanford told the Plaintiff that he would be transferred back to the first shift at the same hourly rate.[2] The Plaintiff admitted that Ms. Sanford explained that the transfer was necessary because of the

---

[1] The Plaintiff is the father of Ms. Lembke's child.

[2] In his deposition, the Plaintiff stated that his shift was changed on a Monday in either late May or early June, and presently does not dispute that the shift change occurred no later than June 2, 2003.

Defendant's overall staffing situation, including the absence of two employees who were on active duty with the National Guard, and that at the time, he felt "okay" with the shift change.  The Plaintiff also testified that at least one other employee was transferred to a different shift and that the Defendant hired additional part-time employees as a result of the personnel shortage.

On June 3, 2003, that is, the day <u>after</u> the Plaintiff was transferred back to the first shift, Mr. Hood interviewed Mr. Cagwin, met with Ms. Sanford, and produced the Plaintiff's photographs to those supervisors.

In an attempt to raise an issue of material fact as to whether Ms. Sanford knew about the photographs prior to transferring him off of the night shift, the Plaintiff has seized on an obvious typographical error in Ms. Sanford's initial Affidavit that identified "June 2" rather than June 3, 2003 as the date that she met with Mr. Hood.  <u>See</u> "Affidavit of Deeda Sanford," Paragraph 14, attached as Exhibit D to Defendant's "Memorandum In Support" (document #17).   In the same Affidavit, however, Ms. Sanford clearly averred, as the Plaintiff has testified, that the Defendant was unaware of the Plaintiff's participation in the Lembke investigation until Mr. Cagwin and Ms. Sanford met with Mr. Hood, and she has submitted an Amended Affidavit to clarify that the meeting, in fact, occurred on June 3, 2003.  <u>See</u>  Exhibit A to Defendant's "Reply ..." (Document #21).   Moreover, undisputed EEOC records, including contemporaneous notes that Mr. Hood prepared personally, state that he met with Mr. Cagwin and Ms. Sanford on June 3, 2003.

In the light most favorable to the Plaintiff, sometime in mid-June 2003, he first complained to Ms. Sanford that working first shift was preventing him from registering for community college classes scheduled to begin in early August and was interfering with his other job.

On June 17, 2003, the Plaintiff filed an administrative charge of retaliation with the EEOC,

4

contending that the Defendant's June 2, 2003 decision to transfer him back to first shift was in retaliation for his participation in the Lembke investigation. Sometime later, the EEOC issued the Plaintiff what is commonly referred to as a "right to sue" letter.

On July 7, 2003, the Plaintiff submitted his letter of resignation, stating that he could not continue to work first shift due to "lost income and [his] school schedule."

On October 12, 2004, the Plaintiff timely filed the instant Complaint, alleging a claim for retaliation in violation of Title VII and state public policy.[3]

On March 3, 2006, the Defendant filed its "Motion for Summary Judgment" (document #16), which as briefed by the parties presents two issues: whether the Defendant's decision to transfer the Plaintiff to first shift was an adverse employment action, and if so, whether there is a legally-sufficient causal connection between that decision and the Plaintiff's participation in the EEOC's investigation of Ms. Lembke's charges.

Along with his Memorandum in Opposition, the Plaintiff submitted his Affidavit and the Affidavits of several co-workers, including Rachel Reed, Lawrence Spencer, Dawn Hall and Terry Hall.

On April 3, 2006, the Defendant filed its Motion to Strike those Affidavits, contending that the Plaintiff's signature on his Affidavit was not notarized and that the Plaintiff had not identified Ms. Reed. Mr. Spencer, or the Halls as potential witnesses during discovery. In Plaintiff's briefs, however, his counsel has credibly explained that the Plaintiff's Affidavit was, in fact, notarized, but that the notary's seal was not scanned into the image of the Affidavit submitted to the Court's

---

[3] Although the Plaintiff's state public policy claim could also be read to state a purported claim for wrongful termination, in his Memorandum in Opposition, the Plaintiff clarifies that his state law claim parallels his Title VII retaliation claim. See document #18 at 25.

5

Electronic Case Files system. There is also some indication in the record that the other disputed witnesses <u>were</u> timely disclosed to the Defendant, that is, they were identified in the EEOC's investigatory file which the Plaintiff produced to the Defendant. Accordingly, although neither these Affidavits nor the Plaintiff's other evidence is sufficient to create an issue of material fact, the undersigned has considered all of the Plaintiff's evidence and the Defendant's Motion to Strike will be <u>denied</u>.

The Defendant's Motion for Summary Judgment has been fully briefed as set forth above and is now ripe for disposition.

## II. <u>DISCUSSION OF CLAIMS</u>

### A. <u>Summary Judgment Standard</u>

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and. . . the moving party is entitled to a judgment as a matter of law." <u>Accord</u> <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. <u>Id</u>. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

Regarding the Plaintiff's state public policy claim, North Carolina courts "look to federal decisions [in Title VII cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." N.C. Dept. of Correction v. Gibson, 308 N.C. 131, 136, 301 S.E.2d 78, 82 (1983). Accord Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir. 1995); Phillips v. J.P. Stevens & Co., Inc., 827 F.Supp. 349, 353 (M.D.N.C. 1993) ( "[t]he public policy of North Carolina expressed in N.C.G.S. § 143-422.1 et seq. is essentially identical to the public policy articulated in Title VII"); and Brewer v. Cabarrus Plastics, Inc., 146 N.C.App. 82, 551 S.E.2d 902, 904 (2001).

Accordingly, the undersigned will apply the elements and paradigm of proof established for Title VII retaliation claims to determine the Plaintiff's state public policy claim.

### B. Retaliation Claim

Title VII prohibits employers from retaliating against an employee who "oppose[s] any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."

42 U.S.C. § 2000e-3.[4]

In the absence of direct evidence of retaliation (which the Plaintiff concedes is not present here), to establish a prima facie case of retaliation in violation of Title VII, an employee must show that: 1) the employee engaged in protected activity;  2) the employer took adverse employment action against the employee;  and 3) a sufficient causal connection existed between the protected activity and the adverse action.  McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991), citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), abrogated in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  See also Hopkins v. Baltimore Gas and Electric Company, 77 F.3d 745, 754 (4th Cir. 1996); and  Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Generally, once a plaintiff has made the required prima facie showing, the burden shifts to the employer to produce a "legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case."  Ross, 759 F.2d at 365, citing Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980).

If the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. Id., citing Womack, 619 F.2d at 1296.

---

[4] In its entirety, Title 42 U.S.C. §2000e-3 provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Accord St. Mary's Honor Ctr., 509 U.S. at 506-11.

Essentially, to prove retaliation a plaintiff must establish that the adverse action would not have occurred "but for" the protected activity. Id. at 365-66. "A causal relationship requires more than simple coincidence... Causation requires [that] the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax, 905 F.Supp. 324, 328 (E.D.N.C. 1995).

In determining what constitutes an "adverse employment action," the Supreme Court has held that a plaintiff must establish "a significant change in employment status, such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus. v. Ellerth, 524 U.S. 723, 761 (1998). Accord Von Gunten, 243 F.3d at 865 ("evidence that the terms, conditions, or benefits of employment were adversely effected is the sine qua non of an adverse employment action"); Boone v. Goldin, 178 F.3d 253, 256-57 (4th Cir. 1999) (employer's decision not to transfer an employee "does not qualify as an adverse employment action unless the decision had some significant detrimental effect on the employee ... absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action"); Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (court has "consistently ... focused on the question whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting and compensing"); Welcome v. Wix Corporation, ___ F. Supp. 2d. ___, ___ (W.D.N.C. February 17, 2006) (denial of employee's request to transfer from third to first shirt was "no more than issue of convenience, which [wa]s clearly insufficient" to constitute an adverse employment action) and Nichols v. Comcast Cablevision of Maryland, 84 F.Supp. 2d 642, 654 (D. Md. 2000)

9

(to demonstrate an adverse employment action, a plaintiff "must establish more than a mere inconvenience or an alteration of job responsibilities").

Concerning the third required element, "the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the [causation] element of the prima facie case." Causey v. Balog, 162 F.3d 795, 803-04 (4th Cir. 1998). Accord Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998).

In the present case, the Plaintiff engaged in a single "protected activity" prior to being transferred to the first shift, that is, he participated in an EEOC investigation by taking pictures of Mr. Cagwin sleeping and providing them to EEOC Investigator Hood. See 42 U.S.C.A. § 2000e-3(a) (defining "protected activity" as "participating in an ongoing investigation or proceeding under Title VII, or... opposing discriminatory practices in the workplace" and defining "participation" as "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII"). Accord Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998) (same). The Plaintiff has therefore satisfied the first element of his retaliation claim.

Applying these legal principles to the facts in this case, and even taking the record in the light most favorable to the Plaintiff, however, he has failed to raise an issue of material fact as to whether the Defendant's decision to transfer him to the first shift constituted an adverse employment action. Indeed, the Plaintiff has not identified any legally significant differences between working on the on the first shift versus the night shift, and admits that his compensation on both shifts was the same. Although Plaintiff's desire to further his education and training and his willingness to work a second job are admirable, his preference for night shift work amounts to no more than an issue of

convenience, which is insufficient to support a Title VII claim for disparate treatment.  Accord Ellerth, 524 U.S. at 761;  Boone, 178 F.3d at 256-57; Welcome, ___ F. Supp. 2d. at ___ ; and Nichols, 84 F.Supp. 2d at 654.

The Plaintiff's evidence also clearly fails to create a genuine issue of material fact as to the final prima facie element.  Indeed, assuming arguendo that the transfer back to first shift amounted to an adverse employment action, the evidence in the light most favorable to the Plaintiff establishes that the transfer occurred the day before Mr. Hood met with the Defendant's supervisors and when, the Plaintiff admits, the Defendant first learned that the Plaintiff had photographed Mr. Cagwin. In other words, because the Defendant did not know of the Plaintiff's protected activity at the time it transferred him back to the first shift, the required causal connection between the protected activity and the purported adverse employment action is manifestly absent.  Accord  Causey, 162 F.3d at 803-04; and Dowe, 145 F.3d at 657.

Moreover, even if the Plaintiff could make out a prima facie case, the Defendant has articulated a legitimate, nondiscriminatory reason for transferring him to another shift, that is, a staff shortage and the need for qualified personnel on the first shift.  In the face of the Defendant's legitimate purpose, for the same reasons that he could not establish a prima facie case of retaliation, as well as because it is undisputed that the Plaintiff initially returned to the first shift without complaint, he is also unable to carry his ultimate burden of showing that the Defendant's decision to transfer him from the night to the first shift was the result of unlawful retaliation.

For these reasons, the Defendant's Motion for Summary Judgment must and will be granted.

## III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. The Defendant's "Motion to Strike" (document #20) is **DENIED**.

2. The Defendant's "Motion for Summary Judgment" (document #16) is **GRANTED**; and the Complaint is **DISMISSED WITH PREJUDICE**.

3. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED**.

Signed: May 2, 2006

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge